# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## OLIVER BEIRNE *vs.* EDWIN M. BROWN.

### January Term, 1870.

1. If a complainant in a bill in equity filed to enforce a vendor's lien against real estate, make sub-purchasers parties to the suit, although they may not have been necessary parties, they are proper parties, and having been made parties by the complainant and he not asking to dismiss the bill as to them, must take the consequences of joining them, and an affidavit made and filed by them, or one of them, in pursuance with the act of the 28th of February, 1865, known as the "suitor's test oath" act, is sufficient to authorize the dismissal of the bill of the complainant, he being required by order of the court to do so, and failing to take the oath required by said act.

2. The act of the 28th of February, 1865, known as the "suitors' test oath," is constitutional.

3. In December, 1862, A. bought land of B., and paid, on the 4th of January, 1863, 5,000 dollars of the purchase money in confederate treasury notes, and in June, 1863, tendered the residue of the purchase money due the vendor, in like currency, which B. declined to receive. In May, 1866, B. filed his bill in equity against A. to enforce his lien against the land for said residue, and made V., a sub-purchaser, a party defendant to the suit. V. made and filed an affidavit under the act of the 28th of February, 1865, known as the "suitors' test oath," and an order was made in the cause requiring B. to take the oath required by that act, which he failed to do, and his bill was dismissed. HELD:

   That the cause of action having arisen prior to the first of April, 1865, the order of the circuit court was properly made, notwithstanding the suit was instituted after the passage of the act of the first of March, 1866, which required, that a complainant in any case, wherein the cause of action arose since the 1st of April, 1865, or should thereafter arise, should not be required to take the oath known as the "suitors' test oath," until the defendant shall have also taken said oath.

This was a suit in equity brought in the circuit court of Monroe county, before Judge Nathaniel Harrison, and was brought on appeal to this court by Beirne, the complainant in the court below, and the case is fully stated in the opinion of Judge Berkshire.

*Boggess* for the appellant.

*Lee* for the appellee.

BERKSHIRE, J.  In May, 1866, the appellant instituted a suit in equity against the appellee, the object of which was to enforce the vendor's lien on a certain tract of land in Monroe county, which the former sold to the latter in December, 1862.  The contract shows that the price of the land was 25 dollars per acre, which was to be paid in cash or in deferred payments, with interest, as the parties should agree upon.  The tract was supposed to contain upwards of six hundred acres, and the complainant was to have it accurately surveyed and the quantity ascertained.

The bill was filed in June, 1866, and alleges that the complainant had theretofore had the land surveyed, and the tract contained 614 acres, and that only 5,000 dollars of the purchase money had been paid, and asks that the land be decreed to be sold for the residue.  In September, 1866, the answer of the defendant was filed, and it was therein admitted that the purchase was made at the time, and for the price stated in the bill, and the payment of the 5,000 dollars is also admitted; but it is averred that it was paid in confederate notes or currency, and that by the agreement and contract between the complainant and defendant, the whole of the purchase money was to be paid in the same kind of currency.  That in pursuance of the contract, he tendered the residue of the purchase money in such currency, to the complainant, in April, 1863, (the 5,000 dollars being paid on the 5th of January, preceding), but that he delayed from time to time to receive it, and finally refused to receive it, and it is insisted that the complainant should sustain the

loss, as the confederate notes owned and tendered by the defendant had depreciated in value, and become worthless. It is also averred that the defendant had sold parts of the land to sundry sub-purchasers.

After the filing of the answer, the complainant obtained leave to file several amended bills, in which he made the derivitive purchasers parties defendants: among the number being, Anderson C. Vass and Allen C. Vass.

After the amended bills were filed, the defendants Anderson C. and Allen C. Vass, filed their separate affidavits averring their own loyalty and the complainant's complicity with the late rebellion, in pursuance of the acts of the 11th and 28th of February, 1865, and the 1st of March, 1866, and asking that the suit be dismissed unless the complainant should take and file the oath prescribed by the first named act, and an order was thereupon made by the court that, the suit be dismissed unless the complainant take and file the required oath within thirty days from the date thereof.

Upon the making of this order, the complainant filed his affidavit, in the nature of a protest and exceptions, addressed to the court, and alleging sundry facts and reasons why his suit should not be dismissed upon the affidavit of the two Vass'. These affidavits, and the protest of the complainant, appear to have been filed on the 26th or 27th of September, 1867; and on the 29th of November, 1867, an order was made dismissing the bill with costs, but without prejudice, &c.

The first ground of objection assigned in the complainant's protest is, that the law requiring the oath to be taken by suitors, is repugnant to the constitution of the United States and of this State, and therefore void.

In the argument here, this position was ably maintained by the appellant's counsel, who insisted that this law affected not alone the remedy, but took away and destroyed the vested rights of suitors, namely, the right to sue for and recover a just debt or demand, and that such right to enforce,

by suit, payment or compensation, necessarily constituted a material and important part of any contract. The authorities on this question are numerous and not altogether harmonious, and it will be found that the cases in which the law has been sustained as affecting only the remedy, are often very difficult, on account of the nicety of the distinctions drawn, to distinguish from the cases which have held the law invalid because impairing a vested right; and it would be found a very difficult and perplexing task to reconcile the authorities and to trace and establish the boundary which separates the two class of cases, and to assign to each class definite limits beyond which the doctrine would not be extended.

On the one hand, it seems well enough settled that an act may materially change and diminish a pre-existing remedy and still be a valid law, while on the other hand, a law which takes away the entire remedy will be held invalid, as affecting and impairing a vested right. But the view I must take of this case renders it unnecessary to enter upon the embarrassing enquiry as to which class the act under consideration properly belongs, as I think its validity may be vindicated on other grounds.

This law belongs to a class of statutes which depend for their validity on a peculiar state of facts and the condition of the country at the time of their enactment. It was passed pending the late rebellion, and was therefore the exercise of one of the war powers of the State, and operated as a *quasi* confiscation of the rights of the enemies of the State, which they otherwise might have had after the war, to sue in the courts of the State.

That the general government during a war, either public or internal, has the right to confiscate the property of the enemy, whether public or domestic, is too firmly settled to be called in question, notwithstanding the slight intimations of doubt expressed in some modern cases and authorities, and the strong objections urged against the exercise of such powers. And it is equally well established, I think, upon

principle and authority, that a State, under similar circumstances, has a like power to confiscate the property of her enemies, and it necessarily follows that it may take away or withhold from such enemy any rights or privileges derived under the laws of the State.

I do not propose, therefore, at this time, to enter upon the discussion of the question of power of confiscating in the government or State, but will content myself with adding that, in my apprehension, to deny to a State the power and right, in time of peril and war, to perpetuate the disabilities of her citizens who had forfeited their rights, as such, by voluntarily engaging in an effort to subvert the government, and with it the State and the country, whose jurisdiction they now invoke to enforce the rights thus forfeited, would be to restrict her sovereign power to very narrow and unsafe limits altogether incompatible with the public welfare and safety, and inconsistent with any just idea of sovereignty.

If the laws we are considering had been passed after the close of the war, and the right to sue had reverted to and reinvested in the parties to which it applies, it is not perceived upon what principle of law it could be sustained as a valid law, as it would clearly destroy the vested right to sue existing at the time of its passage. But as no such right, as we have seen, did exist in the present instance, at the time the act was passed, I think its validity cannot be successfully assailed.

In this case, the debt was contracted pending the war in 1862, and if the appellant occupied the attitude of an enemy at that time, as is probable was the case, he clearly had no right to enforce the contract in the courts of the State of Virginia under the reorganized government, at the time he entered into it, and consequently no right in his case has ever in fact been forfeited.

But it was maintained here in the second place, that the act in question does not apply to this case for the reason that the cause of action did not accrue to the appellant un-

til after the first of April, 1865, and to sustain this position, it was necessary to assume the ground that, in this instance, the right of the appellant to sue for the breach of his contract in the non payment of this debt, was the cause of action; and it was further maintained, that under the contract of the appellant and appellee, the former could not sue for the residue of the purchase money until he had first had an accurate survey of the land made and the exact quantity ascertained; which alone could determine the amount of purchase money still remaining unpaid, for which he could bring his suit, which it was insisted was not done until the 2d of July, 1865, as shown by the report of the survey filed in the case.

If the position of the appellant's counsel, that the right to sue, in this instance, constitutes the cause of action within the sense of the act of the first of March, 1866, could be successfully maintained, I would still be unable to concur with him in his conclusions as to the fact that the right to sue did not accrue to the appellant until after the first of April, 1865. On the contrary, I think it may fairly be deduced from the whole record, that it existed before that time, and that the parties have each precluded themselves from making such objections here.

This suit was instituted in May, 1866, and in June, 1866, the bill was filed, in which it is alleged that the complainant had theretofore had the land surveyed in pursuance of his contract, and that the tract contained 614 acres, agreeing exactly with the report of the surveyor filed in the cause, bearing date on the 2d of July, 1866. It is evident, therefore, that the survey must have been made before the filing of the bill, otherwise the quantity could not have been known; but the report was probably not formally prepared until the time it bears date. The time when the survey was actually made does not therefore appear on the record, and I do not think we are required to assume that it was not made until after the first of April, 1865, in order to sustain an objection taken here for the first time, alleging af-

firmatively, that it was made after that time; and the more especially so, as in the protest and exceptions filed by the appellant at the time of the making of the order requiring him to take the suitors' test oath, no such objection is made, nor is it intimated that the cause of action did not accrue to him until after the first of April, 1865.

The appellee also admits, in effect, in his answer, that the survey had been made and the quantity of land ascertained, as early as April, 1863. For he says that he paid 5,000 dollars of the purchase money on the 5th of January, 1863, as alleged in the bill, and tendered the balance of it in April, 1863, thus admitting that the residue of the purchase money had then been ascertained by actual survey, as it could be determined by no other mode.

But I am of opinion that, under a proper consideration of the act last cited, the cause of action therein referred to is the contract, promise, or undertaking, and not merely the right to sue for the breach thereof, as it is evident that in the absence of such contract, promise or undertaking, there could be neither a cause nor a right of action.

. It was further insisted that, the cause of action should have been heard and proceeded in as to the other defendants, notwithstanding the affidavit of the two Vass' who, it was claimed, were not necessary parties, and dismissed only as to them. But being *bona fide* purchasers from the complainant's vendee, before the institution of the suit, they were directly and perhaps largely interested in the subject matter of the suit, and therefore proper and necessary parties, and so considered to be by the appellant, as evidenced by making them defendants. The affidavits filed by them, therefore, brought the case within the very letter of the act under consideration, and it was held in the case of *Nadenbousch and Riddle* v. *Sharer and Martin*, 2 W. Va. Rep., 285, that the suit must be dismissed if the defendants, or some one of a number of defendants, made the necessary affidavit, unless the plaintiffs, or some one of the plaintiffs, should take and file the oaths required by the said act.

I think it clear, therefore, that it was not competent for the circuit court to have considered the other objections set forth in the appellant's protest and exceptions; as upon the filing of the affidavits by the said Vass', in conformity to the acts before cited, it could not do otherwise than to dismiss the suit upon the failure of the complainant to take and file the required oaths within the time prescribed in the previous order requiring the same to be filed.

Upon the whole, I think there is no error in the decree complained of and the same will have to be affirmed.

BROWN, *President.*

In the second section of the first article of the constitution of the United States, the right to engage in war without the consent of Congress, is reserved to the States respectively, if actually invaded or in such imminent danger as will not admit of delay; and with the consent of Congress the State may engage in war without such restrictions, and may even in time of peace keep troops and ships of war. This right of a State to engage in a war of self-defence on her own account, is recognized and maintained in *Luther* v. *Border*, 7 How., 1; *Pierce* v. *Carskadon, infra.* One of the rights of war is the right to confiscate the enemy's property and debts, and the right to confiscate absolutely includes the power to do it partially or conditionally. *Rose* v. *Himely*, 4 Cranch; *Kirk* v. *Smith*, 9 Wheat., 241; *Reed* v. *Reed*, 5 Call. And in the latter case, Marshall, C. J., said:

"It will be recollected that, those on whom this law" (the Pennsyvania confiscation act of 1779) "acted, were the subjects of an enemy, and that the legislature possessed full power over their estates. Having the power to confiscate absolutely, they might modify that power in its exercise, as to them might seem proper."

In the late war of rebellion, the State of West Virginia was engaged not only in common with the loyal States as a part of the Union, in the effort to preserve it intact, but on

her own account, in her own defence, against actual invasion and insurrection.

Pending that state of war, the act of February 11th, 1865, was passed, and entitled an act to prevent the prosecution of suits by persons engaged in rebellion.  Had the act confiscated the debts of those engaged in rebellion, the power to do it as a war measure could not successfully have been controverted, any more than the power to raise armies and repel the public enemy.  Such absolute confiscation would effectually and forever, unless repealed, have debarred the enemy creditors from the right to sue in the courts of the State for those debts thus confiscated.  By the common law an enemy has no right to be entertained in court. *Quarrier's case*, 2 W. Va. Rep., 571; *Sanderson v. Morgan*, 39 N. Y., 231. But the common law within the States depended upon the power and authority of the States respectively adopting it, and they might adopt any other rule, whether broader or more restricted in its operation, but not the less obligatory. The statute in question has extended greatly the common law restraint upon an enemy's suing, but has still left it far short of confiscation of the debt, or even entire and unconditional deprivation of the right to sue for its recovery. The effect of the statute was to debar one who was a rebel from suing a loyal man for a cause of action accruing during the war, but then only on condition the loyal man required the plaintiff to take the oath prescribed by the act, but the act as modified by the act of 1866, had not the effect to debar a rebel from suing a rebel upon such cause of action, nor did it otherwise take away his right to the debt which he might collect or sell as he could.  "Having the power to confiscate absolutely, the legislature might modify that power in its exercise as to them might seem proper;" and so they did.  The repeal of the statute would restore to the parties affected by it, the right to sue for debts which they are entitled to have, but which that statute denies them the means to enforce.  And the important question is, whether or not the fourteenth amendment to the constitu-

tion of the United States has not in effect repealed or abrogated the statute in that particular.   By that amendment it is provided that—"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It cannot be denied that those who were engaged in the rebellion, and against whom, as enemies, the act in question was directed, are citizens of the United States, and so protected by the said amendment against the operation of any State law incompatible with it.

Is, then, the act in question inconsistent with the said amendment?   By the amendment no State shall make or enforce any law denying to any person within its jurisdiction the equal protection of the laws.   Here there are two classes of persons affected by the act, both having acknowledged legal rights to debts due them.   Persons of the one class are protected in their rights to sue and recover the debts due them, and those of the other class, save in certain contingencies, are prohibited from suing to recover theirs.   Here then, as respects these two classes of creditors, there is a wide difference and marked inequality in the protection given by the laws, and in respect to the debtors, a like difference and inequality exists.   For, if an ex-rebel be sued by an ex-rebel, the defendant cannot dismiss the suit by putting the plaintiff to the test oath of the act; but if an ex-rebel sues a loyal debtor, the defendant may dismiss the suit by putting the plaintiff to that test oath.   This statute then, in effect, denies to persons, and among them the plaintiff having acknowledged legal rights, that equal protection of the laws which the fourteenth amendment guarantees and was intended to secure.   It is therefore, in effect, repealed by it, so far as thus repugnant.   It is objected, however, that the fourteenth amendment cannot affect pre-existing laws, and therefore, if rights or restric-

tions were existing under former laws, they must continue unimpaired.    But such a construction would defeat the great and controlling purpose of the amendment, which was more than any other, to secure to the African race, just liberated from the condition of slavery, the rights of personal liberty, private property, and the equal protection of the laws; in other words, those civil rights which had theretofore been rarely and imperfectly accorded or recognized by the laws of the respective States where they resided, and but for the amendment, such state and condition of things, it was apprehended, would continue to exist, and the protection intended wholly and forever fail.

Again, since the foregoing opinion was written, it is understood that the suitors' test oath act has been repealed by the present legislature, but I have not seen it.

But it is objected that the judgment complained of was rendered before the repeal, and also before the adoption of the fourteenth amendment to the constitution of the United States, and cannot, therefore, be affected by either.    But as to the effect thus produced on this or any pre-existing judgment, it is not necessary to determine in this case, since the view I take of other points in the cause disposes of the case and renders it unnecessary to consider the subject.    Should, however, the judgment have to be reversed for any other cause, the effect of the repeal would doubtless have a bearing on any future proceedings which might be attempted under the provisions of the act repealed.

The defendants Vass, were not necessary parties to the suit, and the relief to which the plaintiff was entitled, was against his vendee, and the Vass's who were vendees of the vendee, of parts of the land sold by complainant to Brown, could by no possibility be made liable for the original purchase money due from Brown to complainant, until the land had been exhausted which remained in the original vendee's hands.    The dismission of the case, therefore, as to the Vass's, could not affect the original purchaser, by increasing the burthen on him which should be borne by all the

parties, nor was there any joint obligation on the part of the defendants, nor privity of contract between them all and the plaintiff.

I think, therefore, that the dismission should only have extended to the said Vass's, who made their affidavit as provided by the act. The decree should therefore be reversed and the cause remanded.

MAXWELL, J. The Vass's, though they may not have been necessary parties, are proper parties, and having been made parties by the complainant, and the complainant not asking to dismiss the bill and amended bills as to them, must take the consequences of joining them. Story's Eq. Pl., sec. 156.

The case comes within the rule of the case of *Nadenbousch and Riddle* v. *Sharer and Martin*, 2 W. Va. Rep., 285; and upon the authority of that case the bill and amended bills were properly dismissed for the failure of the complainant to take the oath required.

DECREE AFFIRMED.